**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| VANESSA HILL, individually and on behalf of all others similarly situated,<br><br>v.<br><br>AHS MANAGEMENT COMPANY, INC. d/b/a ARDENT HEALTH SERVICES; and BSA HEALTH SYSTEM MANAGEMENT, LLC | **Case No. 3:23-cv-01045-WDC-JSF**<br>FLSA Collective Action<br>Fed. R. Civ. P. 23 Class Action<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br><br>Magistrate Judge Jeffery S. Frensley<br><br>Jury Trial Demanded |

# PLAINTIFF'S SECOND AMENDED NATIONWIDE COLLECTIVE AND CLASS ACTION COMPLAINT

## SUMMARY

1. Like many other companies across the United States, AHS Management Company, Inc. d/b/a Ardent Health Service ("Ardent") and its subsidiary BSA Health System Management, LLC's ("BSA") Kronos-based timekeeping and payroll systems were affected by a service outage in beginning in December 2021.

2. That outage led to problems in timekeeping and payroll throughout Ardent and BSA's organizations.

3. As a result, Ardent and BSA's workers who were not exempt from overtime under federal law were not paid for all hours worked and/or were not paid their proper overtime premium on time, if at all, for all hours worked during and after the onset of the Kronos outage.

4. To date, Ardent has not paid these workers over $1.2 million in wages during that time.

5. BSA has likewise not paid its workers for some or all of their work during that time either.

6. Vanessa Hill is one of the Ardent and BSA workers affected by these pay and business practices.

7. Ardent and BSA's failure to pay wages, including proper overtime, on time and in full for all hours worked violates the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*

8. Hill worked for Ardent and BSA during the Kronos outage and was affected by these pay practices—just like Ardent and BSA's other nonexempt workers.

9. This action was brought to recover the unpaid wages and other damages Ardent and BSA owe Hill and all these workers under the law, including unpaid wages, liquidated damages, penalties, interest, and other remedies provided by federal law.

10. After this action was first brought in October 2023, Ardent and BSA knowingly engaged in a pattern of behavior that was intended to, and did, deceive Hill and further erode the rights of Hill and similarly situated workers to obtain these wages.

11. Ardent and BSA believed, or intended to take the position in this lawsuit, that Ardent was not the employer of Hill or similarly situated workers.

12. At the same time, Ardent and BSA knew Hill believed, and induced Hill to further believe, that Ardent was the employer of Hill and similarly situated workers.

13. Ardent and BSA also knew Hill believed, and induced Hill to further believe, that Ardent was not contesting it was the employer of Hill and similarly situated workers for the purposes of the wage-and-hour claims in this lawsuit.

14. Based upon this, Ardent entered into a tolling agreement with Hill, that it led Hill to believe, would toll the statute of limitations of her and similarly situated workers'

wage-and-hour claims, in order to give Ardent time to access pay data and to engage in pre-litigation and pre-discovery mediation.

15. Ardent and BSA believed or knew it would claim Ardent was not the employer of Hill and similarly situated employees, and therefore Ardent and BSA had no intention of negotiating or mediating in good faith.

16. Hill did not know of Ardent and BSA's belief or intent to assert that Ardent was not the employer of Hill and similarly situated workers, and relied on Ardent's representations that the statute of limitations applicable to Hill and the similarly situated workers' wage-and-hour claims were tolled to allow Ardent time to access data and provide the parties' with the time to attempt to mediate those wage-and-hour claims.

17. While Ardent and BSA believed, or knew they would intend to claim, BSA and Ardent's other subsidiaries were the actual employers of Hill and similarly situated workers, Ardent and BSA knew Hill was unaware of the information that it possessed or the defense to employment it intended to later make.

18. Ardent and BSA therefore hatched a scheme whereby they would take advantage of the knowledge gap, rather than apprising Hill of the disagreement or intent to dispute that Ardent was the employer of Hill and similarly situated workers.

19. Instead, Ardent and BSA would "run out the clock" on the statute of limitations applicable to Hill's and similarly situated employees' wage-and-hour claims under the guise the statute of limitations on the claims was tolled as to Ardent, who was not disputing employment as to the tolled group of employees.

20. After scheduling the mediation, Ardent requested that the parties reschedule the mediation twice, under the pretense that it was unavailable or could not produce relevant data in time for the scheduled mediations.

21. Ultimately, Ardent finally committed to and attended a mediation set for December 18, 2024—the week marking three years after the onset of the Kronos outage—and the date under which the FLSA's statute of limitations would begin to run under certain legal theories, absent a tolling agreement.

22. Two days prior to the mediation, Ardent and BSA pulled the proverbial rug out from underneath Hill.

23. On that date, Ardent claimed, **for the first time**, that the tolling agreement that it had entered with Hill was ineffectual to toll the statute of limitations for herself or the other Ardent workers' wage-and-hour claims.

24. Consistent with its nefarious plan, Ardent only then disclosed its position—two days prior to the mediation—that the tolling agreement between Hill and Ardent did not cover any claims as to Hill or the similarly situated employees, because they were not employed by Ardent, but instead by other Ardent-related corporate entities.

25. Ardent proclaimed "gotcha."

26. **For the first time**, Ardent said—and Ardent and BSA now continue to maintain—the statute of limitations has run on Hill's and similarly situated workers' wage-and-hour claims against the proper defendant-employers,

27. Contrary to Hill's contemporaneous understanding, her reliance on the written tolling agreement with Ardent, and Ardent's position up until two days before the December 18, 2024, mediation, Ardent and BSA now openly contend the tolling agreement between

Ardent and Hill did not actually toll the statute of limitations for Hill or similarly situated workers' claims against their "proper" employers.

28. Although the December 18, 2024, mediation went forward, Ardent's conduct beginning two days before reflected Ardent and BSA's newfound legal position that it long intended to utilize against Hill and similarly situated workers.

29. Although the parties began their virtual mediation on December 18, 2024, it ended abruptly when Ardent's corporate representative simply got up and left without warning, refusing to return to the mediation that was still in session.

30. Ardent and BSA perpetrated this fraudulent scheme so it could "run out the clock" and contend the statute of limitations had run completely against the entities it would then claim were the proper legal employers of Hill and the other Ardent and BSA workers under federal and state wage-and-hour laws.

31. Hill seeks to recover, on behalf of herself and similarly situated employees, the damages not related to the underlying wage-and-hour violations, but also those damages caused by Ardent and BSA's fraudulent scheme to avoid the consequences of those federal and state wage-and-hour law violations.

## JURISDICTION & VENUE

32. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. 29 U.S.C. § 216(b).

33. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because both Ardent and BSA are headquartered in this District.

## PARTIES

35. **Plaintiff Vanessa Hill** is a natural person.

36. Hill was, at all relevant times, an employee of Ardent.

37. Hill worked for Ardent during the Kronos outage.

38. Hill was, at all relevant times, an employee of BSA.

39. Hill worked for BSA during the Kronos outage.

40. Hill represents at least four groups of similarly situated persons.

41. Hill represents a collective of similarly situated workers under the FLSA pursuant to 29 U.S.C. § 216(b). This "FLSA Collective" is defined as:

> **All persons who are current or former non-exempt employees of Ardent during any pay period affected by Kronos Private Cloud outage, beginning on or about December 11, 2021, until the time that Ardent regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations.**

42. Hill represents another collective of similarly situated workers under the FLSA pursuant to 29 U.S.C. § 216(b). This "BSA Collective" is defined as:

> **All persons who are current or former non-exempt employees of BSA during any pay period affected by Kronos Private Cloud outage, beginning on or about December 11, 2021, until the time that Ardent regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations.**

43. Throughout this Complaint, the FLSA and BSA Collective members are referred to jointly as the "Similarly Situated Workers."

44. Hill represents a class of similarly situated workers under Tennessee law pursuant to Federal Rule of Civil Procedure 23. This "Wage Class" is defined as:

> **All persons who are current or former non-exempt employees of Ardent and/or BSA during any pay period affected by Kronos Private Cloud outage, beginning on or about December 11, 2021, until the**

> **time that they regained full access to all Kronos products and services, <u>and</u> resumed normal employee timekeeping and payment operations.**

45. Hill represents another class of similarly situated workers under Tennessee law pursuant to Federal Rule of Civil Procedure 23. This "Fraud Class" is defined as:

> **All persons who worked for Ardent from December 11, 2021, or in any pay period affected by the Kronos hack if earlier, until December 23, 2024.**

46. **Defendant BSA Health System Management Company, LLC ("BSA")** is a foreign limited liability company.

47. BSA maintains its headquarters and principal place of business in this District.

48. BSA does business in a systematic and continuous manner throughout Tennessee and this District.

49. At all relevant times, one or more of BSA's ultimate members were citizens of Tennessee.

50. BSA may be served by service upon its registered agent, **Corporation Service Company, 211 E. 7th St., Ste. 620, Austin, TX 78701**, or by any other method allowed by law.

51. BSA owns and operates medical facilities throughout the Texas panhandle and surrounding area.

52. The facilities owned and operated by BSA include, but are not limited to:

- ADC Endoscopy Specialists
- Advanced Imaging Center of Amarillo
- Amarillo Legacy Medical
- BSA Advanced Wound Care Clinic
- BSA Amarillo Diagnostic Clinic
- BSA Amarilo Surgical Group
- BSA Behavioral Health
- BSA Cardiothoracic Surgery
- BSA CareXpress

- BSA Compassion Home Care
- BSA Family Medical Clinic
- BSA Harrington Breast Center
- BSA Harrington Cancer Center
- BSA Hospice of the Southwest
- BSA Hospital
- BSA Outpatient Therapy Services
- BSA Panhandle Ear, Nose & Throat
- BSA Sleep Disorders Center
- BSA Urgent Care Center
- ER on Soncy
- Open Air Imaging Center
- Panhandle Nuclear Pharmacy
- Panhandle Surgical Hospital
- Quail Creek Physical Therapy
- Quail Creek Physical Therapy

53. These are some, but not all, of the interrelated companies within BSA's integrated enterprise.

54. BSA operates these entities as a single integrated employer under the FLSA.

55. At all relevant times, the operation of all of BSA's entities was interrelated.

56. At all relevant times, BSA had centralized/shared back-office operations, including but not limited to human resources, accounting, marketing, risk management, financial operations and legal compliance.

57. At all relevant times, BSA exerted operational control over its subsidiaries and alter egos.

58. At all relevant times, BSA substantially controlled the terms and conditions of employment for workers of its subsidiaries and alter egos.

59. At all relevant times, BSA had a common control and management of labor relations regarding employees of its subsidiaries and alter egos.

60. BSA employed and/or jointly employed, with its subsidiaries and alter egos, Hill and the BSA Collective.

61. Ardent and its respective subsidiaries and alter egos are joint employers of the BSA Collective for purposes of the FLSA.

62. Throughout this Complaint, BSA and its subsidiaries and alter egos are referred to jointly as "BSA."

63. **Defendant AHS Management Company, Inc. d/b/a Ardent Health Services ("Ardent")** is a domestic corporation.

64. Ardent maintains its headquarters and principal place of business in this District.

65. Ardent may be served by service upon its registered agent, **Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312**, or by any other method allowed by law.

66. Ardent owns and operates medical facilities throughout the United States.

67. The facilities owned and operated by Ardent include, but are not limited to:

- Bailey Medical Center
- Hackensack Meridian Mountainside Medical Center
- Hackensack Meridian Pascack Valley Medical Center
- Heart Hospital of New Mexico at Lovelace Medical Center
- Hillcrest Hospital Claremore
- Hillcrest Hospital Cushing
- Hillcrest Hospital Henryetta
- Hillcrest Hospital Pryor
- Hillcrest Hospital South
- Hillcrest Medical Center
- Lovelace Medical Center
- Lovelace Medical Group
- Lovelace Regional Hospital
- Lovelace UNM Rehabilitation Hospital
- Lovelace Westside Hospital

- Lovelace Women's Hospital
- Oklahoma Heart Institute
- Physicians Surgical Hospitals
- Portneuf Medical Center
- Seton Medical Center Harker Heights
- The University of Kansas Health System St. Francis Campus
- Tulas Spine & Specialty Hospital
- UT Health Athens
- UT Health Carthage
- UT Health east Texas Long-Term Acute Care
- UT Health East Texas Rehabilitation Center
- UT Health Henderson
- UT Health Jacksonville
- UT Health North Campus Tyler
- UT Health Pittsburg
- UT Health Quitman
- UT Health Tyler
- Utica Park Clinic

68. Ardent's subsidiaries and alter egos include, but are not limited to:

- Bailey Medical Center
- Hackensack Meridian Mountainside Medical Center
- Hackensack Meridian Pascack Valley Medical Center
- Heart Hospital of New Mexico at Lovelace Medical Center
- Hillcrest Hospital Claremore
- Hillcrest Hospital Cushing
- Hillcrest Hospital Henryetta
- Hillcrest Hospital Pryor
- Hillcrest Hospital South
- Hillcrest Medical Center
- Lovelace Medical Center
- Lovelace Medical Group
- Lovelace Regional Hospital
- Lovelace UNM Rehabilitation Hospital
- Lovelace Westside Hospital
- Lovelace Women's Hospital
- Oklahoma Heart Institute
- Physicians Surgical Hospitals
- Portneuf Medical Center
- Seton Medical Center Harker Heights
- The University of Kansas Health System St. Francis Campus
- Tulas Spine & Specialty Hospital
- UT Health Athens

- UT Health Carthage
- UT Health east Texas Long-Term Acute Care
- UT Health East Texas Rehabilitation Center
- UT Health Henderson
- UT Health Jacksonville
- UT Health North Campus Tyler
- UT Health Pittsburg
- UT Health Quitman
- UT Health Tyler
- Utica Park Clinic

69. Ardent also owns and operates BSA facilities, including, but not limited to:

- ADC Endoscopy Specialists
- Advanced Imaging Center of Amarillo
- Amarillo Legacy Medical
- BSA Advanced Wound Care Clinic
- BSA Amarillo Diagnostic Clinic
- BSA Amarilo Surgical Group
- BSA Behavioral Health
- BSA Cardiothoracic Surgery
- BSA CareXpress
- BSA Compassion Home Care
- BSA Family Medical Clinic
- BSA Harrington Breast Center
- BSA Harrington Cancer Center
- BSA Hospice of the Southwest
- BSA Hospital
- BSA Outpatient Therapy Services
- BSA Panhandle Ear, Nose & Throat
- BSA Sleep Disorders Center
- BSA Urgent Care Center
- ER on Soncy
- Open Air Imaging Center
- Panhandle Nuclear Pharmacy
- Panhandle Surgical Hospital
- Quail Creek Physical Therapy
- Quail Creek Physical Therapy

70. These are some, but not all, of the interrelated companies within Ardent's integrated enterprise.

71. Ardent operates these entities as a single integrated employer under the FLSA.

72. At all relevant times, the operation of all of Ardent's entities was interrelated.

73. At all relevant times, Ardent had centralized/shared back-office operations, including but not limited to human resources, accounting, marketing, risk management, financial operations and legal compliance.

74. At all relevant times, Ardent exerted operational control over its subsidiaries and alter egos.

75. At all relevant times, Ardent substantially controlled the terms and conditions of employment for workers of its subsidiaries and alter egos.

76. At all relevant times, Ardent had a common control and management of labor relations regarding employees of its subsidiaries and alter egos.

77. Ardent employed and/or jointly employed, with its subsidiaries and alter egos, Hill and the FLSA Collective.

78. Ardent and its respective subsidiaries and alter egos are joint employers of the FLSA Collective for purposes of the FLSA.

79. Throughout this Complaint, Ardent and its subsidiaries and alter egos, including BSA, are referred to jointly as "Ardent."

**COVERAGE UNDER THE FLSA**

80. At all relevant times, Ardent was an employer of Hill within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

81. At all relevant times, Ardent was and is an employer of the FLSA Collective within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

82. Ardent was and is part of an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

83. In particular, Ardent is an entity covered by the FLSA because it is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit). 29 U.S.C. 203(s)(1)(B).

84. Since at least October 6, 2020, to the present, Ardent has had gross annual sales in excess of $500,000.

85. At all relevant times, Ardent was and is part of an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1).

86. At all relevant times, Ardent simultaneously operated in two or more states.

87. Ardent employs many workers, including Hill, who are engaged in commerce or in the production of goods for commerce and/or who handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce by any person.

88. The goods and materials handled, sold, or otherwise worked on by Hill and other Ardent employees and that have been moved in interstate commerce include, but are not limited to, medical equipment and supplies.

89. The activities performed by Hill and other Ardent employees were in connection with the operation of Ardent's hospitals. 29 U.S.C. § 203(r)(2)(A).

90. At all relevant times, BSA was an employer of Hill within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

91. At all relevant times, BSA was and is an employer of the BSA Collective within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

92. BSA was and is part of an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

93. In particular, BSA is an entity covered by the FLSA because it is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit). 29 U.S.C. 203(s)(1)(B).

94. Since at least October 6, 2020, to the present, BSA has had gross annual sales in excess of $500,000.

95. At all relevant times, BSA was and is part of an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1).

96. At all relevant times, BSA simultaneously operated in two or more states.

97. BSA employs many workers, including Hill, who are engaged in commerce or in the production of goods for commerce and/or who handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce by any person.

98. The goods and materials handled, sold, or otherwise worked on by Hill and other BSA employees and that have been moved in interstate commerce include, but are not limited to, medical equipment and supplies.

99. The activities performed by Hill and other BSA employees were in connection with the operation of BSA's hospitals. 29 U.S.C. § 203(r)(2)(A).

## FACTS REGARDING WAGE VIOLATIONS

100. Ardent owns and operates healthcare facilities across the United States.

101. Ardent owns and operates 30 hospitals and over 200 sites of care with more than 1,400 aligned providers in 6 states. Ardent, About Us, https://ardenthealth.com/about/about-us (last visited Dec. 30, 2024).

102. Ardent employs healthcare workers in Idaho, Kansas, New Jersey, New Mexico, Oklahoma, and Texas. Ardent, About Us, https://ardenthealth.com/about/about-us (last visited Dec. 30, 2024).

103. Many of Ardent's employees are non-exempt hourly and salaried workers.

104. BSA owns and operates healthcare facilities across the Texas panhandle and surrounding area.

105. BSA employes over 3,000 persons. BSA, About Us, https://bsahs.org/patients-and-visitors/about-us/ (last visited Dec. 30, 2024).

106. Many of BSA's employees are non-exempt hourly and salaried workers.

107. Since at least 2021, Ardent and BSA have used Kronos Private Cloud ("Kronos") for its timekeeping.

108. On or about December 11, 2021, the Kronos system suffered a disruption in service due to a ransomware attack.

109. The Kronos outage interfered with the ability of Kronos users, including Ardent and BSA, to use Kronos to track hours and pay employees.

110. For at least a portion of time following the Kronos hack, Ardent and BSA failed to accurately track the hours that Hill and Similarly Situated Workers worked.

111. For at least a portion of time following the Kronos outage, Ardent and BSA failed to correctly pay Hill and Similarly Situated Workers for the hours that it did track, or for hours that were not tracked.

112. Instead, Ardent and BSA used various methods to estimate the number of hours Hill and Similarly Situated Workers have worked in each pay period.

113. As a result of Ardent and BSA's failure to accurately track the actual hours worked each week, employees who were non-exempt were in many cases paid less than the hours they worked in the workweek, including overtime hours.

114. As a result of Ardent and BSA's failure to accurately pay non-exempt employees the hours that they reported each week, employees who were non-exempt were in many cases paid less than the hours they worked in the workweek, including overtime hours.

115. Many employees were not paid for all their non-overtime wages for hours worked in certain workweeks.

116. Hill is one of the many Ardent and BSA employees affected by these pay and timekeeping practices.

117. Hill regularly worked over 40 hours per week for Ardent and BSA.

118. Hill worked for Ardent and BSA for more than 40 hours in one or more workweeks during the Kronos outage.

119. But Hill was not paid the proper overtime premium for all hours worked on time, if at all, for each of those weeks after the onset of the Kronos service disruption, on or about December 11, 2021.


Case 3:23-cv-01045 Document 49 Filed 06/16/25 Page 16 of 59 PageID #: 471

120. In properly calculating and paying overtime to a non-exempt employee, the only metrics that are needed are: (1) the number of hours worked in a day or week, and (2) the employee's regular rate, taking into account shift differentials, non-discretionary bonuses, and other factors allowed under the law.

121. Ardent knows it has to pay proper overtime premiums to non-exempt hourly and salaried employees.

122. Ardent knows this because, prior to the Kronos hack, it routinely paid these workers for all overtime hours at the proper overtime rates.

123. Ardent could have instituted any number of methods to accurately track and timely pay its employees for all hours worked.

124. But Ardent did not accurately track time and fully and timely pay employees for the time they worked, including overtime hours, and at the regular rates at which they were supposed to be paid.

125. It was feasible for Ardent to put in timekeeping and pay systems during the Kronos outage so that employees could be timely paid the full and correct amounts of money they were owed for the work they did for the company.

126. But Ardent failed to put a competent system in place to ensure that happened.

127. In other words, Ardent pushed the effects of the Kronos hack onto the backs of its most economically vulnerable workers, making sure that it kept the money it owed to those employees in its own pockets, rather than taking steps to make sure its employees were paid on time and in full for the work they did.

128. BSA knows it has to pay proper overtime premiums to non-exempt hourly and salaried employees.

129. BSA knows this because, prior to the Kronos hack, it routinely paid these workers for all overtime hours at the proper overtime rates.

130. BSA could have instituted any number of methods to accurately track and timely pay its employees for all hours worked.

131. But BSA did not accurately track time and fully and timely pay employees for the time they worked, including overtime hours, and at the regular rates at which they were supposed to be paid.

132. It was feasible for BSA to put in timekeeping and pay systems during the Kronos outage so that employees could be timely paid the full and correct amounts of money they were owed for the work they did for the company.

133. But BSA failed to put a competent system in place to ensure that happened.

134. In other words, BSA pushed the effects of the Kronos hack onto the backs of its most economically vulnerable workers, making sure that it kept the money it owed to those employees in its own pockets, rather than taking steps to make sure its employees were paid on time and in full for the work they did.

135. An employer cannot set up inefficient timekeeping and payroll systems and then claim it is not responsible for the timely payment of wages. *Cahill v. City of New Brunswick*, 99 F.Supp.2d 464, 475 (D.N.J. 2000).

136. Yet, in the wake of the Kronos outage, that is exactly what Ardent and BSA did.

137. Hill is just one of the many front-line employees who had to shoulder the burden of this decision by Ardent and BSA.

138. Hill is just one of the many Ardent and BSA employees who had to shoulder the burden of Ardent's timekeeping and payroll policies and practices.

139. Hill was a non-exempt hourly employee of Ardent and BSA.

140. Hill regularly worked over 40 hours per week for Ardent and BSA.

141. Hill's normal, pre-Kronos outage hours are reflected in Ardent and BSA's records.

142. Hill regularly worked over 40 hours per week for Ardent and BSA on one or more workweeks during payroll cycles affected by the Kronos outage.

143. Ardent had a contractual agreement with Hill to pay her for all hours worked.

144. Hill's contractual agreement with Ardent required her to be paid for all hours worked at an amount equal to her regular rate for hours up to 40 in a workweek, and at an overtime premium of no less than 1.5x her regular rate of pay for hours over 40 in a workweek.

145. BSA had a contractual agreement with Hill to pay her for all hours worked.

146. Hill's contractual agreement with BSA required her to be paid for all hours worked at an amount equal to her regular rate for hours up to 40 in a workweek, and at an overtime premium of no less than 1.5x her regular rate of pay for hours over 40 in a workweek.

147. In payroll cycles affected by the Kronos outage, Ardent did not timely pay Hill and the FLSA Collective for their actual hours worked each week.

148. In payroll cycles affected by the Kronos outage, BSA did not timely pay Hill and the BSA Collective for their actual hours worked each week.

149. In payroll cycles affected by the Kronos outage, Ardent did not accurately record the hours worked by Hill and the FLSA Collective, in multiple workweeks.

150. Ardent was aware of the overtime requirements of the FLSA.

151. Ardent nonetheless failed to pay the full overtime premium owed to certain non-exempt hourly and salaried employees, such as Hill.

152. Ardent nonetheless failed to pay the full overtime premium owed to certain non-exempt hourly and salaried employees, such as Hill.

153. Ardent's failure to pay overtime to these non-exempt workers constitutes a willful violation of the FLSA.

154. In payroll cycles affected by the Kronos outage, BSA did not accurately record the hours worked by Hill and the FLSA Collective, in multiple workweeks.

155. In payroll cycles affected by its Kronos outage, Ardent did not timely pay Hill and its other workers pursuant to its contractual agreement with them, in multiple workweeks.

156. In payroll cycles affected by its Kronos outage, BSA did not timely pay Hill and its other workers pursuant to its contractual agreement with them, in multiple workweeks.

157. BSA was aware of the overtime requirements of the FLSA.

158. BSA nonetheless failed to pay the full overtime premium owed to certain non-exempt hourly and salaried employees, such as Hill.

159. BSA nonetheless failed to pay the full overtime premium owed to certain non-exempt hourly and salaried employees, such as Hill.

160. BSA's failure to pay overtime to these non-exempt workers constitutes a willful violation of the FLSA.

161. The full overtime wages owed to Hill and the Similarly Situated Workers became "unpaid" when their work was done—that is, on Hill and the Similarly Situated Workers' regular paydays. *See, e.g.*, *Martin v. United States*, 117 Fed. Cl. 611, 618 (2014); *Biggs v. Wilson*, 1 F.3d 1537, 1540 (9th Cir.1993); *Cook v. United States*, 855 F.2d 848, 851 (Fed. Cir.

1988); *Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1579 (11th Cir.1985), *modified*, 776 F.2d 265 (11th Cir.1985); *Atlantic Co. v. Broughton*, 146 F.2d 480, 482 (5th Cir.1944); *Birbalas v. Cuneo Printing Indus.*, 140 F.2d 826, 828 (7th Cir.1944).

162. At the time Ardent failed to pay Hill and the FLSA Collective in full for their overtime hours by their regular paydays, Ardent became liable for all liquidated damages and any other damages owed under federal law.

163. At the time BSA failed to pay Hill and the BSA Collective in full for their overtime hours by their regular paydays, Ardent became liable for all liquidated damages and any other damages owed under federal law.

164. In other words, there is no distinction between late payment and nonpayment of wages under federal law. *Biggs v. Wilson*, 1 F.3d 1537, 1540 (9th Cir.1993).

165. Any payment made by Ardent to Hill or the Similarly Situated Workers that Ardent may allege represents previously unpaid wages was not supervised by the Department of Labor or any court.

166. The untimely payment of overtime wages, in itself, does not resolve a claim for unpaid wages under the law. *See*, *e.g.*, *Seminiano v. Xyris Enterp., Inc.*, 602 Fed.Appx. 682, 683 (9th Cir. 2015); *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352-54 (11th Cir. 1982).

167. Nor does the untimely payment of wages, if any, compensate workers for the damages they incurred due to Ardent or BSA's acts and omissions resulting in the unpaid wages in the first place.

168. Hill and the FLSA Collective remain uncompensated for the wages and other damages owed by Ardent under federal law.

169. Hill and the BSA Collective remain uncompensated for the wages and other damages owed by BSA under federal law.

### Respondeat Superior / Vicarious Liability Regarding Fraud Claims

170. At all relevant times, Ardent's agents, including Steve Petrovich, were employed, contracted, or otherwise authorized by Ardent and acting in furtherance of the business of Ardent.

171. Each respective agent remains individually liable for their own illegal and improper actions.

172. Ardent remains liable for the improper acts and omissions of its principal officers and its other agents, under respondeat superior and vicarious liability.

### Conditions Precedent Regarding Fraud Claims

173. All conditions precedent to Hill and the Fraud Class's right to recover have been performed or have occurred.

174. Hill and the Fraud Class rely on and plead the discovery rule regarding any statute of limitations defense that may be asserted by Ardent, including fraudulent concealment.

### Additional Facts Regarding Fraud Claims

175. Hill initially filed this FLSA lawsuit against Ardent on October 6, 2023. ECF No. 1.

176. As part of her claims in this lawsuit, Hill sought to recover on behalf of the entire FLSA Collective. ECF No. 1.

177. The Fraud Class consists of those employees who would have been in the FLSA Collective, as defined in Hill's Original Complaint. ECF No. 1.

178. On October 11, 2023, Ardent's counsel contacted Hill's counsel to inform Hill's counsel they had been retained by Ardent.

179. Ardent's counsel at that time has now appeared on behalf of BSA.

180. Ardent's counsel requested, on the same date, that Ardent be permitted to waive service.

181. Hill consented to a waiver, which was sent on the same date and executed by Ardent's counsel on the same date, making Ardent's responsive pleading due on or before December 10, 2023. ECF No. 10.

182. On the same date, Hill's counsel also inquired whether Ardent would agree to toll the statute of limitations on Hill and similarly situated workers' wage-and-hour claims so that the parties could discuss a resolution before Hill proceeded immediately to contested discovery and to file a motion for notice to issue to the similarly situated workers.

183. On October 20, 2023, Hill's counsel forwarded a draft tolling agreement for Ardent's review.

184. Shortly before Ardent's responsive pleadings deadline, on December 1, 2023, Ardent's counsel contacted Hill's counsel to confer regarding the proposed tolling agreement.

185. Ardent agreed that a tolling agreement was warranted, because Ardent claimed it needed time to obtain time and pay data related to the Kronos outage, which Ardent claimed it had not yet been able to access.

186. Ardent never stated it was not the employer of Hill or any similarly situated workers.

187. Ardent never stated it would claim it was not the employer of Hill or any similarly situated workers.

188. Ardent never stated BSA was the true employer of Hill or any similarly situated workers.

189. Ardent never stated it intended to claim BSA was the true employer of Hill or any similarly situated workers.

190. Ardent never stated any other entity should be included in the tolling agreement.

191. Ardent and BSA knew that, absent a tolling agreement, Hill would not agree to delay the litigation, because Hill would not agree to allow the statute of limitations applicable to the wage-and-hour claims for her and the Fraud Class to lapse while pursuing mediation.

192. Ardent led Hill to believe it was entering into a valid tolling agreement which tolled Hill's and similarly situated workers' wage-and-hour claims.

193. Hill reasonably relied on Ardent's representations.

194. Hill reasonably relied on Ardent's acts and omissions.

195. On December 4, 2023, Ardent's counsel memorialized the proposal by email to Hill's counsel.

196. On December 7, 2023, Hill and Ardent executed a formal contract regarding the tolling proposal (the "Tolling Agreement").

197. The terms of the Tolling Agreement are incorporated by reference.

198. The Tolling Agreement between Hill and Ardent provided, in relevant part:

> The statute of limitations on any Fair Labor Standards Act claim set forth in the pending Action shall not run during the duration of this Agreement against Putative Opt-In Plaintiffs who worked for Defendant from December 11, 2021, or in any pay period affected by the Kronos hack if earlier, and until this Agreement is no longer in effect as set forth in paragraph 2 of this Agreement and shall also not run

> during the duration of this Agreement against any Putative Opt-In Plaintiff.

Tolling Agmt., at ¶ 1.

199. In reliance on the Tolling Agreement, Hill consented to Ardent's **first** requested extension of Ardent's responsive pleading deadline to February 9, 2024. ECF No. 12.

200. As the February 9, 2024, deadline approached, Ardent claimed it needed additional time to gather information and data related to the lawsuit.

201. In reliance on the Tolling Agreement, Hill consented to Ardent's **second** requested extension, and the deadline for Ardent's responsive pleading was reset to April 9, 2024. ECF No. 13.

202. On March 29, 2024, Ardent claimed it had obtained limited data that would be needed, but that it needed additional time to gather data.

203. As the April 9, 2024, deadline approached, Ardent claimed it needed additional time to gather information and data related to the lawsuit.

204. In reliance on the Tolling Agreement, Hill consented to Ardent's **third** requested extension, and the deadline for Ardent's responsive pleading was reset to June 10, 2024. ECF No. 15.

205. On June 3, 2024, Ardent's counsel informed Hill's counsel that Ardent was agreeable to mediation of Hill and the FLSA Collective's claims.

206. Ardent's counsel claimed the mediation would need to be later in the year to accommodate Ardent's corporate schedule and the need for additional time to gather information and data necessary to facilitate productive settlement discussions.

207. On June 6, 2024, Hill and Ardent agreed to mediate with Hunter Hughes.

208. On the same date, Hill and Ardent mutually agreed to a mediation date of August 23, 2024.

209. As the June 10, 2024, responsive pleading deadline approached, Ardent requested a **fourth** extension of the responsive pleadings deadline.

210. In reliance on the Tolling Agreement and the Parties' agreement to the August mediation date, and Ardent's related claim that it needed additional time to gather information and data related to the lawsuit for mediation, Hill consented to Ardent's requested extension.

211. Based upon Ardent's **fourth** requested extension, the deadline for Ardent's responsive pleading was reset to September 6, 2024. ECF No. 18.

212. On August 2, 2024, Ardent represented that the mediation could not take place on August 23 because it needed additional time to gather the information and data that would be needed for mediation.

213. Consequently, to accommodate Ardent and believing Ardent was acting in good faith, Hill agreed to reschedule mediation for October 23, 2024.

214. For that reason, again, as the September 6, 2024, pleading deadline approached, Ardent requested additional time to accommodate both the reset mediation and Ardent's gathering of additional information and data related to the lawsuit.

215. In reliance on the Tolling Agreement, due to the forthcoming mediation and her believe Ardent was acting in good faith, Hill consented to Ardent's **fifth** requested extension, and the deadline for Ardent's responsive pleading was reset to November 6, 2024. ECF No. 23.

216. On October 16, 2024, Ardent again represented that the mediation could not take place on October 23 because it was still gathering information and data that would be needed for mediation.

217. At that time, mediator Hughes did not have any available dates for mediation remaining in 2024.

218. Hill would not consent to a mediation in 2025.

219. Consequently, to accommodate Ardent's request to move the October 23 mediation and believing Ardent was acting in good faith, the Parties agreed to mediation with Dennis Clifford, and on October 22, 2024, set mediation with Clifford for December 18, 2024.

220. Before the November 6 deadline, Ardent requested a **sixth** extension of their responsive pleading deadline.

221. Given the forthcoming mediation date and in reliance on the Tolling Agreement, Hill consented to Ardent's **sixth** requested extension.

222. The deadline for Ardent's responsive pleading was reset to January 2, 2025. ECF No. 26.

223. On December 5, 2024, Ardent finally produced to Hill portions, but not all, of the data necessary for mediation.

224. In all, Ardent took an entire year after the execution of the Tolling Agreement on December 7, 2023, to produce any data related to the wage-and-hour claims subject to the Tolling Agreement, on December 5, 2024.

225. December 11, 2024, marked three years since the onset of the Kronos outage.

226. Absent a tolling agreement, this would, under certain legal theories, begin the expiration of the statutes of limitation for claims related to the Kronos outage under the FLSA.

227. On December 16, 2024, Ardent claimed—**for the first time**—that Ardent was not the proper employer-defendant of most or all the Fraud Class members.

228. Therefore, Ardent claimed, the FLSA statute of limitations continued to run for the Fraud Class.

229. The data for all the putative collective members was produced by Ardent for mediation.

230. The data requested by Hill for mediation is the kind of data an employer would maintain regarding its employees.

231. The data requested by Hill under the Tolling Agreement is the kind of data an employer would maintain regarding its employees.

232. Ardent never claimed it could not obtain the requested data regarding Hill.

233. Ardent never claimed it could not obtain the requested data regarding the Fraud Class.

234. Prior to December 18, 2024, Ardent produced some of the data requested by Hill for mediation.

235. Prior to December 18, 2024, Ardent produced some of the data requested by Hill under the Tolling Agreement.

236. Thus, it is readily apparent Ardent knew that these individuals were intended to be covered by Hill's Original Complaint and the Tolling Agreement, yet Ardent simultaneously also knew it planned to claim at the mediation (twice-delayed at Ardent's

insistence) that it was not the proper employer-defendant of those putative collective members.

237. The December 18, 2024, mediation with mediator Clifford was conducted by videoconference.

238. Steve Petrovich attended the December 18 mediation with mediator Clifford on behalf of Ardent.

239. Petrovich is the Chief Legal Officer for Ardent.

240. The parties at mediation made slow progress through the morning and into the early afternoon.

241. At approximately 2:00pm central time, Petrovich abruptly disconnected from the videoconference and refused to participate further in mediation.

242. Ardent's outside counsel remained in the mediation.

243. Petrovich did not explain his departure to Hill or Hill's counsel.

244. Petrovich did not explain his departure to mediator Clifford.

245. Prior to his departure, Petrovich did not provide an explanation to Ardent's counsel to relay to mediator Clifford, Hill, or Hill's counsel.

246. Mediator Clifford had not declared an impasse at the time of Petrovich's unexplained departure.

247. Petrovich refused to return to the mediation.

248. Petrovich's unprecedented and unprofessional behavior prematurely ended the mediation.

249. At approximately 6:55pm central time, Ardent's counsel sent Hill's counsel a notice terminating the Tolling Agreement.

250. Since before it even entered into the Tolling Agreement, Ardent and BSA were aware of the facts that Ardent and BSA intended to claim Ardent was not the employer of Hill or the Fraud Class, which was first communicated by Ardent to Hill and Hill's counsel on December 16, 2024.

251. Since before it even entered into the Tolling Agreement, Ardent was aware it intended to claim it was not the employer of Hill or the Fraud Class, which it first communicated to Hill and Hill's counsel on December 16, 2024,

252. Ardent did not negotiate in good faith.

253. Ardent did not agree to mediate in good faith.

254. Ardent did not mediate in good faith.

255. Ardent never intended to negotiate in good faith.

256. Ardent did not enter into the Tolling Agreement in good faith.

257. Ardent did not maintain the Tolling Agreement in good faith.

258. Ardent did not request to extend its responsive pleadings deadline in good faith.

259. Ardent did not request its first extension to its pleading deadline in good faith.

260. Ardent did not request its second extension to its pleading deadline in good faith

261. Ardent did not request its third extension to its pleading deadline in good faith.

262. Ardent did not request its fourth extension to its pleading deadline in good faith.

263. Ardent did not request its fifth extension to its pleading deadline in good faith.

264. Ardent did not request its sixth extension to its pleading deadline in good faith.

265. Ardent did not set the first mediation in good faith.

266. Ardent did not request to reset the first mediation in good faith.

267. Ardent did not set the second mediation in good faith.

268. Ardent did not request to reset the second mediation in good faith.

269. Ardent did not set the third mediation in good faith.

270. Ardent's representations that it had issues accessing relevant data was not in good faith.

271. Since before Ardent even entered into the Tolling Agreement, BSA was aware it intended to claim Ardent was not the employer of Hill or the Fraud Class, which Ardent communicated to Hill and Hill's counsel for the first time on December 16, 2024,

272. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent and BSA did not negotiate in good faith.

273. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent and BSA did not mediate in good faith.

274. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent and BSA never intended to mediate in good faith.

275. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent did not enter into the Tolling Agreement in good faith.

276. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent did not maintain the Tolling Agreement in good faith.

277. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately after mediation, and the events leading up to the mediation, it is now clear to Hill that none of Ardent's **six** requests that to extend its responsive pleading deadline were in good faith.

278. Based on Ardent and BSA's newly revealed legal positions, Petrovich's behavior at mediation, the cancellation of the Tolling Agreement immediately thereafter, and the events leading up to the mediation, it is clear Ardent's claims it had issues accessing relevant data was not in good faith.

279. Each of Ardent's representations regarding its position as Hill and the Fraud Class's employer for purposes of the FLSA was intended to, and did, prejudice Hill and the Fraud Class.

280. Each of Ardent's representations regarding its position as a proper employer-defendant as to Hill and the Fraud Class for purposes of the FLSA was intended to, and did, prejudice Hill and the Fraud Class.

281. Each of Ardent's representations regarding access to the relevant data was intended to, and did, prejudice Hill and the Fraud Class.

282. Ardent asked the Court for **six** extensions to the responsive pleading deadline so that Hill would not press forward with the claims on behalf of herself and the Fraud Class.

283. Ardent entered into the Tolling Agreement with Hill so that Hill would not press forward the claims on behalf of herself and the Fraud Class.

284. Ardent entered into the Tolling Agreement with Hill so that Hill would not engage in discovery regarding the claims on behalf of herself and the Fraud Class.

285. Ardent entered into the Tolling Agreement with Hill so that Hill would not seek collective certification on behalf of the Fraud Class.

286. Ardent entered into the Tolling Agreement with Hill so that the Fraud Class would not be notified of this action.

287. Ardent entered into the Tolling Agreement with Hill so that the Fraud Class would not opt-into this action.

288. Ardent entered into the Tolling Agreement with Hill so that the statute of limitations would continue to run against Hill and the Fraud Class as to the "proper" employer-defendants, under Ardent's theory.

289. Ardent entered into the Tolling Agreement with Hill so that Fraud Class members in New Mexico and New Jersey would not pursue state law claims against them after opting-into this lawsuit.

290. Since December 16, 2024, Ardent and BSA continue to claim Ardent was not the proper employer of most or all of the Fraud Class.

291. Since December 16, 2024, Ardent and BSA continue to claim Ardent was not the proper defendant for the FLSA claims of most or all of the Fraud Class.

292. Since December 16, 2024, Ardent and BSA continue to claim, the FLSA statute of limitations had continued to run against the Fraud Class during the time the Tolling Agreement was in effect.

293. Ardent filed its Original Answer on January 2, 2025. ECF No. 29.

294. In its Original Answer, Ardent denies it was the employer of Hill. *E.g.*, ECF No. 29, at ¶¶ 11, 28, 29, 31.

295. In its Original Answer, Ardent denies it was the employer of the Fraud Class. *E.g.*, ECF No. 29, at ¶¶ 29, 32.

296. In its Original Answer, Ardent denies it is the proper defendant as to Hill. *E.g.*, ECF No. 29, at ¶¶ 11, 28, 29, 31.

297. In its Original Answer, Ardent denies it is the proper defendant as to the Fraud Class. *E.g.*, ECF No. 29, at ¶ 29, 32.

298. In its Original Answer, Ardent asserts an affirmative defense regarding the statute of limitations as to Hill and the Fraud Class. ECF No. 29, at Aff. Def. 4.

299. In its Original Answer, Ardent asserts an affirmative defense that it did not employ Hill or the Fraud Class. ECF No. 29, at Aff. Def. 6.

300. All the representations by Ardent in its Original Answer were known to Ardent at the time it entered into the Tolling Agreement.

301. Ardent filed its Original Answer to Hill's First Amended Complaint on January 17, 2025. ECF No. 34.

302. In its Original Answer to Hill's First Amended Complaint, Ardent denies it was the employer of Hill. *E.g.*, ECF No. 34, at ¶¶ 25, 65, 66, 68.

303. In its Original Answer to Hill's First Amended Complaint, Ardent denies it was the employer of the Fraud Class. *E.g.*, ECF No. 34, at ¶¶ 66, 69.

304. In its Original Answer to Hill's First Amended Complaint, Ardent denies it is the proper defendant as to Hill. *E.g.*, ECF No. 34, at ¶¶ 25, 65, 66, 68.

305. In its Original Answer to Hill's First Amended Complaint, Ardent denies it is the proper defendant as to the Fraud Class. *E.g.*, ECF No. 34, at ¶ 66, 69.

306. In its Original Answer to Hill's First Amended Complaint, Ardent asserts an affirmative defense regarding the statute of limitations as to Hill and the Fraud Class. ECF No. 34, at Aff. Def. 20.

307. In its Original Answer to Hill's First Amended Complaint, Ardent asserts an affirmative defense that it did not employ Hill or the Fraud Class. ECF No. 34, at Aff. Def. 22.

308. All the representations by Ardent in its Original Answer to Hill's First Amended Complaint were known to Ardent at the time it entered into the Tolling Agreement.

309. All the representations by Ardent in its Original Answer to Hill's First Amended Complaint were known to Ardent before its first requested extension of time to file a responsive pleading.

310. Ardent knew the defenses Ardent intended to assert in this lawsuit at the time it entered into the Tolling Agreement.

311. Ardent knew the defenses Ardent intended to assert in this lawsuit before its first requested extension of time to file a responsive pleading.

312. Ardent knew the identities of the entities it intended to claim were the employers of Hill and the Fraud Class at the time it entered into the Tolling Agreement.

313. Prior to entering into the Tolling Agreement, Ardent did not truthfully disclose information regarding the identities of the corporate entities subject to the Tolling Agreement.

314. Prior to entering into the Tolling Agreement, Ardent did not truthfully disclose information regarding the employers of Hill and the Fraud Class.

315. During the time the Tolling Agreement was in effect, Ardent did not truthfully disclose information regarding the identities of the corporate entities subject to the Tolling Agreement.

316. During the time the Tolling Agreement was in effect, Ardent did not truthfully disclose information regarding the employers of Hill and the Fraud Class.

317. BSA filed its Original Answer to Hill's First Amended Complaint on January 17, 2025. ECF No. 34.

318. In its Original Answer, BSA denies Ardent was the employer of Hill. *E.g.*, ECF No. 34, at ¶¶ 25, 65, 66, 68.

319. In its Original Answer, BSA denies Ardent was the employer of the Fraud Class. *E.g.*, ECF No. 34, at ¶¶ 66, 69.

320. In its Original Answer, BSA denies Ardent is the proper defendant as to Hill. *E.g.*, ECF No. 34, at ¶¶ 25, 65, 66, 68.

321. In its Original Answer, BSA denies Ardent is the proper defendant as to the Fraud Class. *E.g.*, ECF No. 34, at ¶ 66, 69.

322. In its Original Answer, BSA asserts an affirmative defense regarding the statute of limitations as to Hill and the Fraud Class. ECF No. 34, at Aff. Def. 20.

323. In its Original Answer, BSA asserts an affirmative defense that it did not employ Hill or the Fraud Class. ECF No. 34, at Aff. Def. 22.

324. All the representations by BSA in its Original Answer were known to BSA at the time Ardent entered into the Tolling Agreement.

325. BSA knew the identities of the entities Ardent and BSA intended to claim were the employers of Hill and the Fraud Class at the time Ardent entered into the Tolling Agreement.

326. Prior to Ardent entering into the Tolling Agreement, BSA did not truthfully disclose information regarding the identities of the corporate entities subject to the Tolling Agreement.

327. Prior to Ardent entering into the Tolling Agreement, BSA did not truthfully disclose information regarding the employers of Hill and the Fraud Class.

328. During the time the Tolling Agreement was in effect, BSA did not truthfully disclose information regarding the identities of the corporate entities subject to the Tolling Agreement.

329. During the time the Tolling Agreement was in effect, BSA did not truthfully disclose information regarding the employers of Hill and the Fraud Class.

330. Hill and the Fraud Class were unaware that Ardent was not their employer within the meaning of the FLSA at any time prior to December 16, 2024.

331. Hill and the Fraud Class were unaware that Ardent intended to claim it was not their employer within the meaning of the FLSA at any time prior to December 16, 2024.

332. Hill and the Fraud Class were unaware that BSA intended to claim Ardent was not their employer within the meaning of the FLSA at any time prior to December 16, 2024.

333. At all times since the Tolling Agreement was executed until December 16, 2024, Hill and the Fraud Class relied on the Tolling Agreement in their litigation strategy and conduct.

334. Prior to entering into the Tolling Agreement, had Ardent disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would not have entered into the Tolling Agreement.

335. Prior to entering into the Tolling Agreement, had BSA disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would not have entered into the Tolling Agreement .

336. Prior to entering into the Tolling Agreement, had Ardent disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would only have entered into a tolling agreement with Ardent or other entities on different terms.

337. Prior to entering into the Tolling Agreement, had BSA disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would only have entered into a tolling agreement with Ardent or other entities on different terms.

338. During the time the Tolling Agreement was in effect, had Ardent disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would have demanded the Tolling Agreement be negotiated to cover these entities.

339. During the time the Tolling Agreement was in effect, had BSA disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement, Hill would have demanded the Tolling Agreement be negotiated to cover these entities.

340. Prior to entering into the Tolling Agreement, had Ardent disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement and refused mutually agreeable terms, Hill would have sought collective certification and fully litigated this matter without delay.

341. Prior to entering into the Tolling Agreement, had BSA disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement and refused mutually agreeable terms, Hill would have sought collective certification and fully litigated this matter without delay.

342. During the time the Tolling Agreement was in effect, had Ardent disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement and refused mutually agreeable terms, Hill would have sought collective certification and fully litigated this matter without delay.

343. During the time the Tolling Agreement was in effect, had BSA disclosed the information regarding its contentions as to the identities of the corporate entities subject to the Tolling Agreement and refused mutually agreeable terms, Hill would have sought collective certification and fully litigated this matter without delay.

344. Ardent intended that Hill rely on its statements to conclude it was the employer of Hill and the Fraud Class.

345. Ardent intended that Hill rely on its statements to conclude it would not challenge that it was the employer of Hill and the Fraud Class.

346. Ardent intended that Hill rely on its actions to conclude it was the employer of Hill and the Fraud Class.

347. Ardent intended that Hill rely on its actions to conclude it would not challenge that it was the employer of Hill and the Fraud Class.

348. Ardent intended that Hill rely on its omissions to conclude it was the employer of Hill and the Fraud Class.

349. Ardent intended that Hill rely on its omissions to conclude it would not challenge that it was the employer of Hill and the Fraud Class.

350. Hill relied on Ardent's statements in concluding Ardent was the employer of her and the Fraud Class.

351. Hill relied on Ardent's statements in concluding Ardent would not challenge it was the employer of her and the Fraud Class.

352. Hill relied on Ardent's actions in concluding Ardent was the employer of her and the Fraud Class.

353. Hill relied on Ardent's actions in concluding Ardent would not challenge it was the employer of her and the Fraud Class.

354. Hill relied on Ardent's omissions in concluding Ardent was the employer of her and the Fraud Class.

355. Hill relied on Ardent's omissions in concluding Ardent would not challenge it was the employer of her and the Fraud Class.

356. BSA intended that Hill rely on its acts and omissions to conclude Ardent was the employer of Hill and the Fraud Class.

357. BSA intended that Hill rely on its acts and omissions to conclude Ardent would not challenge that it was the employer of Hill and the Fraud Class.

358. Hill relied on BSA's acts and omissions in concluding Ardent was the employer of her and the Fraud Class.

359. Hill relied on BSA's acts and omissions in concluding Ardent would not challenge it was the employer of her and the Fraud Class.

360. Ardent and BSA's scheme—if successful—would result in the complete erosion of these claims as to Hill and the Fraud Class.

361. Hill and the Fraud Class should be compensated for Ardent and BSA's illegal and improper scheme.

### Allegations Regarding FLSA Collective

362. Numerous individuals were victimized by Ardent's patterns, practices, and policies, which are in willful violation of the FLSA.

363. Based on her experience and tenure with Ardent, Hill is aware that Ardent's illegal practices were imposed on the FLSA Collective.

364. The FLSA Collective members were not paid their full overtime premiums on time, if at all, for all overtime hours worked.

365. These employees are victims of Ardent's unlawful compensation practices and are similarly situated to Hill in terms of the pay provisions and employment practices at issue regarding the FLSA Collective.

366. The workers in the FLSA Collective were similarly situated within the meaning of the FLSA.

367. Any differences in job duties do not detract from the fact that these FLSA non-exempt workers were entitled to overtime pay.

368. Ardent's failure to pay overtime compensation at the rates required by the FLSA result from generally applicable, systematic policies, and practices, which are not dependent on the personal circumstances of the FLSA Collective members.

369. The FLSA Collective should be notified of this action and given the chance to join pursuant to 29 U.S.C. § 216(b).

## ALLEGATIONS REGARDING BSA COLLECTIVE

370. Numerous individuals were victimized by BSA's patterns, practices, and policies, which are in willful violation of the FLSA.

371. Based on her experience and tenure with BSA, Hill is aware that BSA's illegal practices were imposed on the BSA Collective.

372. The BSA Collective members were not paid their full overtime premiums on time, if at all, for all overtime hours worked.

373. These employees are victims of BSA's unlawful compensation practices and are similarly situated to Hill in terms of the pay provisions and employment practices at issue regarding the BSA Collective.

374. The workers in the BSA Collective were similarly situated within the meaning of the FLSA.

375. Any differences in job duties do not detract from the fact that these BSA non-exempt workers were entitled to overtime pay.

376. BSA's failure to pay overtime compensation at the rates required by the FLSA result from generally applicable, systematic policies, and practices, which are not dependent on the personal circumstances of the BSA Collective members.

377. The BSA Collective should be notified of this action and given the chance to join pursuant to 29 U.S.C. § 216(b).

## ALLEGATIONS REGARDING WAGE CLASS

378. Hill brings claims on behalf of the Wage Class pursuant to Federal Rule of Civil Procedure 23.

### A. Numerosity

379. Numerous other individuals were subject to the same contractual provisions as Hill as a result of Ardent and/or BSA's same conduct and, as a consequence, were subject to the same losses, including backwages and any other remedies available under the law.

380. The Wage Class is so numerous that joinder of all members is impracticable.

381. The precise number of Wage Class members is unknown to Hill at this time but may be ascertained through discovery.

382. Hill believes the number of Wage Class members is in the thousands.

383. The identity of the Wage Class members is readily identifiable from Ardent's records.

### B. Commonality

384. The questions of law and fact common to Hill and the Wage Class's claims predominate over any questions affecting solely any individual members.

385. The common questions of law and fact include, but are not limited to, the following:

a. Whether Ardent and/or BSA's acts and omissions constituted a breach of their contracts with Hill and the Wage Class;

b. Whether Hill and the Wage Class are owed damages for Ardent and/or BSA's acts and omissions; and

c. Whether Ardent and/or BSA unjustly benefitted from its pay practices at the expense of Hill and the Wage Class.

386. Although the issue of damages may be somewhat individual in character, there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude class action treatment.

**C. Typicality**

387. Hill's claims are typical of the Wage Class members' claims.

388. Hill and the Wage Class have sustained damages arising out of Ardent and/or BSA's acts and omissions.

389. All Wage Class members were injured through Ardent and/or BSA's singular acts and omissions in failing to pay Hill and the Wage Class the wages owed under their contracts.

390. Hill advances the same claims and legal theories on behalf of the class as for herself.

391. Hill's claims are therefore typical of those of the Wage Class.

**D. Adequacy of Representation**

392. Hill will fairly and adequately protect the interests of the Wage Class.

393. Hill has retained counsel experienced in claims such as this and in complex class action litigation, and Hill intends to prosecute this action vigorously.

394. Hill has no interest contrary to, or in conflict with, the Wage Class.

395. Like each member of the Wage Class, Hill has an interest in obtaining the damages owed under the law.

**E. Superiority**

396. A class action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

397. The damages suffered by each individual class member is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Ardent. It would thus be virtually impossible for class members, on an individual basis, to obtain effective redress for the wrongs done to them.

398. Even if class members could afford individualized litigation, such individualized litigation would place tremendous strain on the judicial system.

399. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.

400. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.

401. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, comprehensive supervision by a single court, and judicial consistency.

402. A class action presents no unusual management difficulties under the circumstances here.

403. Hill knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class action.

404. Absent this action, many Wage Class members likely will not obtain redress of their injuries and Ardent and/or BSA will reap the unjust benefits of violating the law.

## ALLEGATIONS REGARDING FRAUD CLASS

405. Hill brings claims on behalf of the Fraud Class pursuant to Federal Rule of Civil Procedure 23.

### F. Numerosity

406. Numerous other individuals were subject to the same contractual provisions as Hill as a result of Ardent's same conduct and, as a consequence, were subject to the same losses, including backwages, liquidated damages, and any other remedies that would have been available under federal or state wage-and-hour law.

407. The Fraud Class is so numerous that joinder of all members is impracticable.

408. The precise number of Fraud Class members is unknown to Hill at this time but may be ascertained through discovery.

409. Hill believes the number of Fraud Class members is in the thousands.

410. The identity of the Fraud Class members is readily identifiable from Ardent and BSA's records.

### G. Commonality

411. The questions of law and fact common to Hill and the Fraud Class's claims predominate over any questions affecting solely any individual members.

412. The common questions of law and fact include, but are not limited to, the following:

a. Whether Ardent and BSA's acts and omissions constituted promissory fraud, fraudulent misrepresentation, and/or negligent misrepresentation upon Hill and the Fraud Class;

b. Whether Hill and the Fraud Class are owed damages for Ardent and BSA's acts and omissions; and

c. Whether Ardent's acts and omissions entitle Hill and the Fraud Class to recover the damages they would have been owed based upon applicable federal and state wage-and-hour laws.

413. Although the issue of damages may be somewhat individual in character, there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude class action treatment.

**H. Typicality**

414. Hill's claims are typical of the Fraud Class members' claims.

415. Hill and the Fraud Class have sustained damages arising out of Ardent's acts and omissions.

416. All Fraud Class members were injured through Ardent and BSA's singular acts and omissions in inducing Hill into the Tolling Agreement on the terms onto which it was entered, and based upon Ardent's singular acts and omissions during period in which the Tolling Agreement was in effect.

417. Hill advances the same claims and legal theories on behalf of the class as for herself.

418. Hill's claims are therefore typical of those of the Fraud Class.

**I. Adequacy of Representation**

419. Hill will fairly and adequately protect the interests of the Fraud Class.

420. Hill has retained counsel experienced in claims such as this and in complex class action litigation, and Hill intends to prosecute this action vigorously.

421. Hill has no interest contrary to, or in conflict with, the Fraud Class.

422. Like each member of the Fraud Class, Hill has an interest in obtaining the damages owed under the law.

**J. Superiority**

423. A class action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

424. The damages suffered by each individual class member is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Ardent. It would thus be virtually impossible for class members, on an individual basis, to obtain effective redress for the wrongs done to them.

425. Even if class members could afford individualized litigation, such individualized litigation would place tremendous strain on the judicial system.

426. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.

427. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.

428. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, comprehensive supervision by a single court, and judicial consistency.

429. A class action presents no unusual management difficulties under the circumstances here.

430. Hill knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class action.

431. Absent this action, many Fraud Class members likely will not obtain redress of their injuries and Ardent will reap the unjust benefits of violating the law.

### 1st Cause of Action—Overtime Violations of the FLSA against Ardent by Hill and the FLSA Collective and against BSA by Hill and the BSA Collective

432. Hill incorporates each allegation set forth in paragraphs 1 through 431.

433. By failing to pay Hill and the FLSA Collective members overtime at 1.5x their regular rates, on time and in full, Ardent violated the FLSA. 29 U.S.C. § 207(a).

434. Ardent owes Hill and the FLSA Collective members overtime for all hours worked in excess of 40 in a workweek, at a rate of at least 1.5x their regular rates of pay.

435. Ardent owes Hill and the FLSA Collective members the difference between the rate actually paid for overtime, if any, and the proper overtime rate.

436. Ardent knowingly, willfully, or in reckless disregard carried out this illegal pattern and practice of failing to pay Hill and the FLSA Collective members the compensation owed to them under the FLSA.

437. Because Ardent knew, or showed reckless disregard for whether, its pay practices violated the FLSA, Ardent owes these wages for at least the past three years prior to the date Hill's Original Complaint was filed.

438. Ardent's failure to pay compensation owed under the FLSA to Hill and the FLSA Collective members was neither reasonable, nor was the decision not to pay overtime made in good faith.

439. Because Ardent's decision not to pay overtime was not made in good faith, Ardent also owes Hill and the FLSA Collective members an amount equal to the unpaid wages as liquidated damages.

440. By failing to pay Hill and the BSA Collective members overtime at 1.5x their regular rates, on time and in full, BSA violated the FLSA. 29 U.S.C. § 207(a).

441. BSA owes Hill and the BSA Collective members overtime for all hours worked in excess of 40 in a workweek, at a rate of at least 1.5 times their regular rates of pay.

442. BSA owes Hill and the BSA Collective members the difference between the rate actually paid for overtime, if any, and the proper overtime rate.

443. BSA knowingly, willfully, or in reckless disregard carried out this illegal pattern and practice of failing to pay Hill and the BSA Collective members the compensation owed to them under the FLSA.

444. Because BSA knew, or showed reckless disregard for whether, its pay practices violated the FLSA, BSA owes these wages for at least the past three years prior to the date Hill's Original Complaint was filed.

445. BSA's failure to pay compensation owed under the FLSA to Hill and the BSA Collective members was neither reasonable, nor was the decision not to pay overtime made in good faith.

446. Because BSA's decision not to pay overtime was not made in good faith, BSA also owes Hill and the BSA Collective members an amount equal to the unpaid wages as liquidated damages.

447. Accordingly, Hill and the BSA Collective members are entitled to their unpaid wages under the FLSA, including their overtime wages in an amount equal to 1.5x their regular rates of pay, plus liquidated damages, attorney's fees, and costs.

## 2ND CAUSE OF ACTION—BREACH OF CONTRACT AGAINST ARDENT AND BSA BY HILL AND THE WAGE CLASS

448. Hill incorporates each allegation set forth in paragraphs 1 through 431.

449. Ardent and/or BSA entered into contractual agreements with Hill and each of the Wage Class members.

450. Ardent and/or BSA's contractual agreements with Hill and the Wage Class members were oral or written contracts.

451. Whether the contractual agreements of Hill and the Wage Class members were formal contracts, collective bargaining agreements, written or oral, or otherwise does not alter Ardent and/or BSA's contractual obligations.

452. Hill and the Wage Class members' status as at-will employees or otherwise is irrelevant to whether they had an enforceable contract for wages with Ardent and/or BSA.

453. Under their contractual agreements, Hill and each of the Wage Class members agreed to perform work for Ardent and/or BSA, and Ardent and/or BSA agreed to fully compensate each worker for all time worked at the agreed upon rates.

454. Hill and the Wage Class members carried out their contractual duties by performing work by Ardent and/or BSA.

455. Ardent and/or BSA breached its agreement with Hill and the Wage Class members by failing to compensate Hill and the Wage Class members for all hours worked at the agreed upon rates.

456. Hill and the Wage Class members had regularly scheduled paydays with Ardent and/or BSA.

457. Ardent and/or BSA failed to pay Hill and the Wage Class members their contractually agreed wages on their regularly scheduled payday.

458. As a result of Ardent and/or BSA's breach of agreement, Hill and the Wage Class members have suffered damages.

459. Hill and the Wage Class members are entitled to recover their contractually agreed wages, liquidated damages, attorneys' fees, costs, and all other legal and equitable relief.

**THIRD CAUSE OF ACTION—UNJUST ENRICHMENT AGAINST ARDENT AND BSA BY HILL AND THE WAGE CLASS**

460. Hill incorporates each allegation set forth in paragraphs 1 through 431.

461. Ardent and BSA's acts and omissions in failing to pay wages to Hill and the Wage Class members was done knowingly, willfully, or with reckless disregard of the rights of Hill and the Wage Class members.

462. Ardent and BSA each accepted the benefits of Hill and the Wage Class members' work, including financial benefits.

463. As a result of their unlawful acts and omissions, Ardent and BSA each received substantial benefits in the form of financial compensation that rightfully belonged to Hill and the Wage Class members.

464. It would be unjust to allow Ardent and/or BSA to retain these benefits, which were gained through unlawful means, including but not limited to, failing to pay Hill and the Wage Class members the earned and agreed-upon wages they were entitled to under the law and/or their contractual agreements with each of Hill and the Wage Class members.

465. Ardent and BSA has been unjustly enriched by their unlawful acts and omissions.

466. Hill and the Wage Class members are entitled to recover for Ardent and/or BSA's unjust enrichment, including restitution and penalties.

467. Hill and the Wage Class are entitled to recover attorneys' fees and costs.

468. Hill and the Wage Class members are entitled to exemplary damages due to Ardent and BSA's unjust enrichment.

469. A constructive trust should be imposed on Ardent and BSA, and the Court should sequester any benefits or money wrongfully received by Ardent and BSA at the expense of Hill and the Wage Class members.

**FOURTH CAUSE OF ACTION—PROMISSORY FRAUD AGAINST ARDENT BY HILL AND THE FRAUD CLASS**

470. Hill incorporates each allegation set forth in paragraphs 1 through 431.

471. Ardent made misrepresentations to Hill regarding the entities subject to the Tolling Agreement.

472. Ardent made misrepresentations to Hill regarding the relationship of the entities subject to the Tolling Agreement as to Hill and the Fraud Class.

473. Ardent made misrepresentations to Hill regarding an employment relationship between Ardent, on one hand, and Hill and/or the Fraud Class members, on the other hand.

474. Ardent made misrepresentations to Hill regarding its intention to dispute an employment relationship between Ardent, on one hand, and Hill and/or the Fraud Class members, on the other hand.

475. Ardent's misrepresentations were material to Hill's decision to enter into the Tolling Agreement, on behalf of herself and the Fraud Class.

476. Ardent's misrepresentations were material to Hill's decision to maintain the Tolling Agreement, on behalf of herself and the Fraud Class.

477. Ardent made the misrepresentations knowingly, without believing they were true, or with reckless disregard.

478. Ardent made the misrepresentations to induce Hill to enter into the Tolling Agreement on behalf of herself and the Fraud Class.

479. Ardent made the misrepresentations to induce Hill to maintaining the Tolling Agreement on behalf of herself and the Fraud Class.

480. Hill, on behalf of herself and the Fraud Class, relied on Ardent's misrepresentations in entering into the Tolling Agreement.

481. Hill, on behalf of herself and the Fraud Class, relied on Ardent's misrepresentations in maintaining the Tolling Agreement.

482. Hill and the Fraud Class have been injured as a result of their reliance on Ardent's misrepresentations.

483. At the time Ardent made the misrepresentations, Ardent did not intend to abide by the Tolling Agreement.

484. At the time Ardent made the misrepresentations, Ardent intended that the statute of limitations run and continue to run in the future, as to Hill and the Fraud Class.

485. The statute of limitations ran regarding Hill and the Fraud Class's claims, in whole or in part, as a result of their reliance on Ardent's misrepresentations.

486. Due to Ardent's acts and omissions, Hill and the Fraud Class are entitled to recover actual damages, consequential damages, punitive damages, attorney's fees, costs, and all other damages permitted under law.

### FIFTH CAUSE OF ACTION—FRAUDULENT MISREPRESENTATION AGAINST ARDENT BY HILL AND THE FRAUD CLASS

487. Hill incorporates each allegation set forth in paragraphs 1 through 431.

488. Ardent made misrepresentations to Hill regarding the entities subject to the Tolling Agreement.

489. Ardent made misrepresentations to Hill regarding the relationship of the entities subject to the Tolling Agreement as to Hill and the Fraud Class.

490. Ardent's misrepresentations were material to Hill's decision to enter into the Tolling Agreement, on behalf of herself and the Fraud Class.

491. Ardent's misrepresentations were material to Hill's decision to maintain the Tolling Agreement, on behalf of herself and the Fraud Class.

492. Ardent made the misrepresentations knowingly, without believing they were true, or with reckless disregard.

493. Ardent made the misrepresentations to induce Hill to enter into the Tolling Agreement on behalf of herself and the Fraud Class.

494. Ardent made the misrepresentations to induce Hill to maintaining the Tolling Agreement on behalf of herself and the Fraud Class.

495. Hill, on behalf of herself and the Fraud Class, relied on Ardent's misrepresentations in entering into the Tolling Agreement.

496. Hill, on behalf of herself and the Fraud Class, relied on Ardent's misrepresentations in maintaining the Tolling Agreement.

497. Hill and the Fraud Class have been injured as a result of their reliance on Ardent's misrepresentations.

498. The statute of limitations ran regarding Hill and the Fraud Class's claims, in whole or in part, as a result of their reliance on Ardent's misrepresentations.

499. Due to Ardent's acts and omissions, Hill and the Fraud Class are entitled to recover actual damages, consequential damages, punitive damages, attorney's fees, costs, and all other damages permitted under law.

## Sixth Cause of Action—Negligent Misrepresentation against Ardent by Hill and the Fraud Class

500. Hill incorporates each allegation set forth in paragraphs 1 through 431.

501. Ardent made misrepresentations to Hill regarding the entities subject to the Tolling Agreement.

502. Ardent made misrepresentations to Hill regarding the relationship of the entities subject to the Tolling Agreement as to Hill and the Fraud Class.

503. Ardent made the representations related to a transaction in which Ardent has a pecuniary interest.

504. Ardent's misrepresentations were intended to guide Hill's decision to enter into the Tolling Agreement, on behalf of herself and the Fraud Class.

505. Ardent's misrepresentations were intended to guide to Hill's decision to maintain the Tolling Agreement, on behalf of herself and the Fraud Class.

506. Ardent's misrepresentations were intended to guide Hill's belief that there was an employment relationship between Ardent, on one hand, and Hill and/or the Fraud Class members, on the other hand.

507. Ardent's misrepresentations were intended to guide Hill's belief that there was no dispute as to the employment relationship between Ardent, on one hand, and Hill and/or the Fraud Class members, on the other hand.

508. Ardent did not use reasonable care in gathering the information upon which its communications to Hill were made.

509. Ardent did not use reasonable care in making the communications to Hill.

510. Hill, on behalf of herself and the Fraud Class, justifiably relied on Ardent's misrepresentations in entering into the Tolling Agreement.

511. Hill, on behalf of herself and the Fraud Class, justifiably relied on Ardent's misrepresentations in maintaining the Tolling Agreement.

512. Hill and the Fraud Class have been injured as a result of their reliance on Ardent's misrepresentations.

513. The statute of limitations ran regarding Hill and the Fraud Class's claims, in whole or in part, as a result of their reliance on Ardent's misrepresentations.

514. Due to Ardent's acts and omissions, Hill and the Fraud Class are entitled to recover actual damages, consequential damages, punitive damages, attorney's fees, costs, and all other damages permitted under law.

## RELIEF SOUGHT

Hill prays for judgment against Ardent as follows:

a. For an order certifying the FLSA and BSA Collectives for their respective FLSA claims;

b. For an order certifying Rule 23 Contract and Fraud Classes for their respective claims;

c. For an order finding Ardent liable for violations of federal wage laws with respect to Hill and the FLSA Collective;

d. For an order finding BSA liable for violations of federal wage laws with respect to Hill and the BSA Collective;

e. For an order equitably tolling the statute of limitations for violations of federal wage laws with respect to Hill and the FLSA Collective;

f. For a judgment awarding all unpaid wages, liquidated damages, and penalty damages, to Hill, the FLSA Collective, and the BSA Collective;

g. For an equitable accounting and restitution of wages due to Hill, the FLSA Collective, the BSA Collective, and the Wage Class;

h. For a judgment awarding actual, consequential, and punitive damages, to Hill, the Wage Class, and the Fraud Class;

i. For a judgment awarding attorneys' fees to Hill, the FLSA Collective, the BSA Collective, the Wage Class, and the Fraud Class;

j. For a judgment awarding costs of this action to Hill, the FLSA Collective, the BSA Collective, the Wage Class, and the Fraud Class;

k. For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law to Hill, the FLSA Collective, the BSA Collective, the Wage Class, and the Fraud Class; and

l. For all such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By: ***/s/ Kimberly De Arcangelis***

**Kimberly De Arcangelis, Esq.**
Florida Bar No.: 0025871
**MORGAN & MORGAN, P.A.**
20 N. Orange Ave., 15th Floor
Orlando, Florida 32801
Telephone: (407) 420-1414
Facsimile: (407) 867-4791
Email: kimd@forthepeople.com

**Matthew S. Parmet**
TX Bar # 24069719
**PARMET PC**
2 Greenway Plaza, Ste. 250
Houston, TX 77046
phone 713 999 5200
matt@parmet.law

**R. Burke Keaty, II**
BPR#027342
**MORGAN & MORGAN – NASHVILLE, PLLC**
801 Broadway, Suite 105
Nashville, TN 37203
(615) 514-4205
bkeaty@forthepeople.com

**Attorneys for Plaintiff**

## JURY DEMAND

Hill demands a trial by jury on all issues.

*/s/ Kimberly De Arcangelis*

______________________________

**Kimberly De Arcangelis**

## CERTIFICATE OF SERVICE

On _______________, 2025, I served a copy of this document and any attachments on the following parties via the Court's CM/ECF system:

| | |
|---|---|
| A. Craig Cleland | craig.cleland@ogletree.com |
| Lauren Zeldin | lauren.zeldin@ogletree.com |
| Harry M. Rowland, III | harry.rowland@ogletree.com |
| Benjamin P. Lemly | benjamin.lemly@ogletreedeakins.com |
| **Attorneys for Defendants** | |
| | |
| Matthew S. Parmet | matt@parmet.law |
| R. Burke Keaty, II | bkeaty@forthepeople.com |
| **Attorneys for Plaintiff** | |

*/s/ Kimberly De Arcangelis*

______________________________

**Kimberly De Arcangelis**